[Cite as *Simon v. Underwood*, 2017-Ohio-2885.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| SUSAN C. SIMON, et al. | : | |
| | : | |
| Plaintiffs-Appellees | : | C.A. CASE NO. 2016-CA-18 |
| | : | |
| v. | : | T.C. NO. 14CV131 |
| | : | |
| JAY A. UNDERWOOD, et al. | : | (Civil Appeal from Common |
| | : | Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____19th____ day of _____May_____, 2017.

. . . . . . . . . .

DAVID A. SKROBOT, Atty. Reg. No. 0018668 and ROBERT J. SIMON, Atty. Reg. No. 0091519, 471 East Broad Street, Suite 1810, Columbus, Ohio 43215
        Attorneys for Plaintiffs-Appellees

WAYNE E. SOUTHWARD, Atty. Reg. No. 0009439 and GREGORY R. FLAX, Atty. Reg. No. 0081206, One S. Limestone Street, Suite 800, P. O. Box 1488, Springfield, Ohio 45501
        Attorneys for Defendants-Appellants Jay A. Underwood and John J. Underwood

. . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** This matter is before the Court on the Notice of Appeal of brothers Jay A. Underwood and John J. Underwood, filed July 15, 2016 (collectively, "the brothers"). The brothers appeal from the June 30, 2016 decision of the trial court overruling their

objections to the report of the Commissioner, which concluded that property devised by their father's Last Will and Testament ("will") to them and their sisters, Susan Simon and Sara Thompson (collectively, "the sisters"), as life-tenants-in-common, cannot be equitably partitioned between the four siblings. We hereby affirm the judgment of the trial court.

{¶ 2} The sisters filed a complaint against the brothers on August 5, 2014. Jay, John, Susan and Sara are the children of J.A. Underwood ("Underwood"). Pursuant to Underwood's June 8, 1981 will, the siblings each received an equal and undivided life estate in: 1) a 25 acre lot identified as parcel no. G21-07-11-09-00-016-00; 2) a 115 acre lot identified as parcel nos. G21-07-11-24-00-014-00; and 3) a 6.7 acre lot identified as parcel nos. G21-07-11-09-00-002-01 and G21-07-11-10-00-008-00 (collectively, "the Property").

{¶ 3} A copy of the will is attached to the complaint and provides in relevant part as follows:

> * * *
>
> I give and devise all of my real property of my real estate, wheresoever situate, to my wife, Alice L. Underwood, for and during the term of her natural life or so long as she may remain unmarried.
>
> After the death of my wife, or in the event or her remarriage, the interest in remainder in said real estate in which I have devised to her a life estate, I give and devise to my four children, Susan C. Simon, Sara Beth Underwood, John Jeffry Underwood and Jay A. Underwood for and during the term of their natural lives.

After the death or remarriage of my wife and upon the death of all of my four children, the interest in remainder in said real estate I give, devise and bequeath to all of my grandchildren living at the death of the last of my four children, equally, share and share alike, absolutely and in fee simple.

* * *

{¶ 4} The complaint further alleges that on December 20, 2007, the siblings created the Underwood Family Partnership ("UFP"), an Ohio general partnership. According to the complaint, the "UFP has failed to be an effective way to manage the Property as the Property is not being properly managed, the partners are deadlocked on major decisions, the financial potential of the Property is not being met, and the partners of the UFP are not acting in the best interests of the UFP." Specifically, the complaint alleges that on January 1, 2013, the Property was appraised at $763,000.00, but in 2012, the UFP made a profit of only $5,466.00, to be divided between the siblings.

{¶ 5} According to the complaint, the brothers refuse to cooperate in the efficient operation of the UFP and to pay reasonable rental values for the Property. The complaint sets forth the following rents, which are allegedly "well below fair market value": 1) Jay rents 20.27 acres of the 115-acre lot for $80.00 per acre per year; 2) Jay rents a 25-acre lot and pays rent of $200.00 per acre per year; 3) John rents 30.23 acres of the 115-acre lot and pays $80.00 per acre per year; and 4) John "does not pay rent for approximately 2 acres of the 115 acre [lot] where his home resides, approximately 18 acres of the 115 acre lot for grazing cattle, and approximately 4.3 acres of the 115 lot for growing hay." The complaint alleges that the rental prices are below market value and "the UFP could not reach an agreed upon rental amount for the Property and the Defendants have used

the Property without the UFP's consent."

{¶ 6} The complaint further alleges that the brothers "have also misused and devalued the buildings and assets located on the Property." Specifically, the complaint alleges that John has harvested timber from the 115-acre lot. The complaint also alleges that on December 30, 2007, Jay's son, Lucas, entered into a rental agreement for the farmhouse on Eris Road, a condition of which required him to pay rent or "spend a certain amount of money on maintenance and improvement of the farmhouse. However, after August 2008 rental payments stopped and no receipts were provided showing repairs or improvements to the farmhouse." The complaint provides that on January 9, 2010, a "Family Partnership House Agreement was executed wherein Defendants agreed to be responsible for the maintenance of the farm house and its gravel lane." The complaint alleges that "the farmhouse has steadily deteriorated and Plaintiffs are informed and believe the farmhouse is now a safety hazard and a potential liability to all."

{¶ 7} The complaint alleges the brothers "benefit from the Property more than the Plaintiffs despite the intentions of the UFP and Defendants refuse to change or alter the current arrangement." According to the Complaint, "the UFP is currently in a voting deadlock and the future of the Property is being jeopardized." The sisters asserted a request for partition, and claims for an accounting, unjust enrichment, breach of fiduciary duty, and dissolution of the partnership.

{¶ 8} Six joint stipulations for extensions of time for Jay and John to answer the complaint were filed. On April 16, 2015, the sisters filed "Plaintiffs' Motion for Injunctive and Declaratory Relief." Therein they sought an order authorizing them "to rent certain farm land to a third party and for a preliminary injunction restricting Defendants Jay and

John Underwood * * * from personally using this land." Ten exhibits were attached to the motion. The brothers opposed the motion on April 21, 2015, and the sisters replied on April 27, 2015.

{¶ 9} On April 29, 2015, the trial court issued a "Journal Entry Denying Plaintiff's Motion for Injunctive and Declaratory Relief." The court initially noted that "it must be mentioned that any claim of irreparable harm is undercut by Plaintiffs' willingness to extend the time for filing an answer on six occasions. Furthermore, Plaintiffs have known of the need to plan for the upcoming growing season since at least last fall's harvest." The court further noted that the sisters "have not explained why any harm resulting from Defendants' alleged failure to pay the market rate for the use of the Troy Fields cannot be addressed through their causes of action for breach of fiduciary duty and unjust enrichment." The court determined that since the sisters "have not explained why monetary damages for Defendants' alleged self-dealing would be an inadequate remedy, they are not entitled to a preliminary injunction." Finally, the court concluded that "if this Court were to find in favor of Plaintiffs on their partition claim, the source of the parties' disagreements (i.e., the farm) would be gone. The possible availability of this remedy to Plaintiff[s] is further reason not to grant a preliminary injunction."

{¶ 10} On May 11, 2015, the sisters filed a "First Amended Complaint." Therein they asserted that pursuant to Underwood's will, "the children of the Plaintiffs' and Defendants' or their issue may obtain an interest in the Property," and that "[a]s all of the Plaintiffs and Defendants are still living, the identities of the remaindermen are not known and may change based [upon] when the last life tenant passes." The sisters requested the court "appoint a disinterested person to act as a representative or guardian ad litem

for the unknown remaindermen who may have a contingent future interest * * *."

{¶ 11} On May 15, 2015, the brothers filed a motion to dismiss the amended complaint, "for failure to file a preliminary judicial report, pursuant to Civ.R. 12(B)(1), 12(B)(6), (12)(B)(7), 19(A)(2), and R.C. § 2329.191." Alternatively, the brothers requested that "the court order Plaintiffs to file a preliminary judicial report and join all necessary parties." On the same date, the sisters filed a "Notice of Filing Title Commitment."

{¶ 12} On May 22, 2015, the court issued a "Journal Entry Setting Response Time," ordering the sisters to respond to the motion to dismiss by May 29, 2015. In the sisters' response, they asserted as follows:

Rather than forcing potential remaindermen to be parties to this action, Plaintiffs believe a guardian or representative can be appointed to act in the best interest of the class. Such appointment would satisfy Defendants' belief all potential remaindermen must be represented in this action. Plaintiffs hope the Court will consider this option as a way of addressing the unknown remaindermen while protecting what remains of the existing family relationships.

{¶ 13} On June 4, 2015, the court issued a "Journal Entry Granting Plaintiffs Leave to File Second Amended Complaint." The court noted that the filing of the commitment for title insurance rendered moot the brothers' argument regarding the failure to file a preliminary judicial report. Citing R.C. 5303.22, the court further noted that "[n]o distinction is made between vested and contingent future interests. Instead, *all persons in being* who are interested in the estate or may become interested in the estate must be made

parties to the action." The court found Underwood's 13 grandchildren to be "essential parties" to the action.

{¶ 14} On June 8, 2015, the "Reply of Defendants Jay A. Underwood and John J. Underwood in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint" was filed. On June 26, 2015, the sisters, James Patrick Thompson, Steven Charles Thompson, Isabelle Jean Thompson-Demoss, Amy Caroline Yeager, Robert Joseph Simon, and Christen Beth Simon Fails filed a "Second Amended Complaint" against the brothers, Nathan Jeffry Underwood, Heath Asbury Underwood, Zachary Ryan Underwood, Lucas Wayne Underwood, Levi Russell Underwood, Logan Lowell Underwood, and Eli Asbury Underwood, asserting a request for partition, and claims for an accounting, unjust enrichment, breach of fiduciary duty, and dissolution of the partnership.

{¶ 15} On July 10, 2015, the brothers answered the amended complaint. On August 24, 2015, the "Answer of Defendants Nathan J. Underwood, Heath A. Underwood, Zachary R. Underwood, Lucas W. Underwood, Levi R. Underwood, Logan L. Underwood, and Eli A. Underwood to Plaintiffs' Second Amended Complaint" was filed.

{¶ 16} On September 2, 2015, the "Motion of Plaintiffs Susan Simon and Sara Thompson for the Appointment of a Commissioner and to Issue a Writ of Partition" was filed, attached to which is a proposed order. The motion provides in part as follows:

> * * * As Plaintiffs have a legal right to the Property, they request the Property be partitioned and a commissioner appointed to determine if the Property can be partitioned.
>
> After the Court's appointment, R.C. 5307.06 states "the

commissioner or commissioners shall view and examine the estate and, on their oaths and having due regard to the improvements, situation, and quality of the different parts, set it apart in lots that will be most advantageous and equitable." Plaintiffs request upon appointment, the commissioner should investigate and examine the Property to determine if partition is possible. Plaintiffs ask that any physical partition of the Property take into consideration the interests of the Remaindermen as potential heirs to the Property.

In the event the Commissioner determines the partitioning of the Property would cause a manifest injury to the value of the Property or the physical partitioning of the Property is impossible or impractical, Plaintiffs request the Commissioner to appraise the Property and provide a just valuation so the parties have an opportunity to exercise their right to purchase the Property.

{¶ 17} The Magistrate set the motion for a hearing on October 6, 2015, and the brothers moved for a continuance, or in the alternative, to set the matter for a scheduling conference. On September 30, 2015, the "Magistrate's Order Denying Defendants' Motion to Continue Hearing" was filed. Therein the Magistrate noted in part that the "Court's need to clarify the legal basis for Count One of the Second Amended Complaint was one of the reasons for scheduling a hearing on Plaintiffs' motion. This need remains unfulfilled."

{¶ 18} Also on September 30, 2015, "Plaintiffs' Partial Opposition to Joint Motion of Defendants to Continue Hearing on Plaintiffs' Motion for Partial Summary Judgment

and/or Convert Same into a Scheduling Conference" was filed. Therein, the Plaintiffs asserted that they do not oppose the request for a scheduling conference, that mediation should not delay the appointment of a Commissioner, and that they have every right to move for the appointment of a Commissioner.

{¶ 19} On October 9, 2015, a "Magistrate's Order Setting Scheduling Conference" was issued after the hearing on October 6th. The order provides in part as follows:

> \* \* \*

> Extensive discussion was held concerning Count One of the Second Amended Complaint. Although captioned as a partition claim, Count One may actually be seeking relief under the disentailment statute, R. C. 5303.21, since it seeks the sale of real property, with the proceeds held in trust. There was also discussion about whether Count One should proceed separately from the remaining claims, which concern the partnership that the Underwood siblings \* \* \* created to manage the day-to-day activities of the farm after they took possession as co-life tenants.

{¶ 20} The court scheduled a conference before the Magistrate on December 2, 2015, and indicated that it "anticipates resolving the following issues":

> (1) Whether Count One of the Second Amended Complaint seeks the partition of the life estate, the partition of the entire fee, disentailment pursuant to R.C. 5303.21, or some other form of relief. Plaintiffs may seek leave to amend their complaint.

> (2) The names of persons to serve as commissioners should Count One of the Second Amended Complaint proceed as a partition action.

(3) Whether Count One of the Second Amended Complaint should proceed separately from the remaining causes of action.

{¶ 21} On November 5, 2016, a "Consent for Plaintiffs to File Third Amended Complaint" was filed, along with a "Third Amended Complaint." Paragraph 24 of the newly amended complaint provides: "As Plaintiffs believe the Property cannot be physically partitioned without creating undue hardship, manifest injury, and/or substantial damage to the value of the Property, Plaintiffs respectfully request the Property be partitioned." [Sic.] Section (b) of the prayer for relief of the newly amended complaint provides that Plaintiffs request "that the net proceeds from the sale of the Property or the respective life estates be distributed as the Court determines appropriate."

{¶ 22} On November 9, 2015, "Plaintiffs Susan Simon and Sara Thompson's Renewed Motion for the Appointment of a Commissioner to Issue Writ of Partition" was filed. On November 20, 2015, the "Answer of Defendants Nathan J. Underwood, Heath A. Underwood, Zachary R. Underwood, Lucas W. Underwood, Levi R. Underwood, Logan L. Underwood, and Eli A. Underwood to Plaintiff's Third Amended Complaint" was filed.

{¶ 23} On November 24, 2015, a "Memorandum of Defendants J. A. Underwood and John J. Underwood in Opposition to Plaintiffs' Renewed Motion for Partial Summary Judgment," was filed. The Magistrate then set a scheduling conference to be held on December 16, 2015. On January 5, 2016, a "Motion of Defendants for Leave to File their Answer to Third Amended Complaint Instanter," and "Agreed Entry," and the "Answer of Defendants Jay. A. Underwood and John J. Underwood to Plaintiffs' Third Amended Complaint" were filed.

**{¶ 24}** On February 23, 2016 the court issued a "Journal Entry Ordering Partition and Appointing Commissioner." The entry provides in part as follows (footnotes omitted):

Plaintiffs Susan Celia Simon and Sara Beth Thompson, and Defendants, Jay A. Underwood and John J. Underwood, are co-life-tenants currently in possession of real property located in Champaign County * * *. Upon the passing of the last life tenant, their children, if they survive all of the life tenants, will obtain a fee simple interest in the Property. If a child should predecease the last life tenant with issue, such issue shall take the deceased's child's share of the Property.

Each co-life tenant possesses an undivided one-quarter interest in the Property for the remainder of their lives. Plaintiffs, Susan Celia Simon and Sara Beth Thompson, seek to hold their respective one-quarter interests in the Property severally from the interests of Defendants, Jay A. Underwood and John J. Underwood. Wherefore, Plaintiffs, Susan Celia Simon and Sara Beth Thompson, are entitled to partition of their interests in the Property as prayed for in the Third Amended Complaint.

**IT IS THEREFORE ORDERED** that partition of the co-life tenants' interest in the Property shall take place.

**IT IS FURTHER ORDERED** that Jerry Simpson, a suitable disinterested person, is appointed Commissioner to divide the co-life tenants' interests in the Property. The Commissioner shall view and examine the Property, taking into account the improvements, situations,

location, and quality of the different parts of the Property.

If the co-life tenants' interest in the Property can be equitably divided, the Commissioner shall report that to the Court and shall set off each co-life tenants' one-quarter interest in the Property.

In dividing the Property, the Commissioner shall set off to each co-life tenant his or her interest in each of the several tracts comprising the Property, or the Commissioner may set off the share of any co-life tenant, in all tracts comprising the Property, according to the Commissioner's best discretion.

If the Commissioner divides one or more of the tracts comprising the Property, said tract(s) shall be surveyed and platted in accordance with sections 711.001 to 711.15 of the Revised Code and with the rules adopted pursuant to these sections.

If the Commissioner is of the opinion that these interests cannot be equitably divided among the life tenants, the Commissioner shall report that to the Court with a just valuation of the fee simple interest of the Property. This figure will be used to determine the value of the co-life tenants' interests in the Property. The Commissioner shall also report the reasons for concluding that the co-life tenants' interests in the Property cannot be equitably divided.

Upon receipt of the Commissioner's report, Plaintiffs' request for partition of the co-life tenants' interests in the Property will proceed in accordance with Chapter 5307 of the Revised Code.

{¶ 25} On April 7, 2016, the court issued a "Journal Entry" that provides that the Commissioner viewed and examined the Property and forwarded his report to the Court. The entry provides in part as follows:

In his report, Commissioner Simpson concludes that * * * the co-life tenants' interests in the Property cannot be equitably divided. He has also fixed the value of the fee simple interest of the Property.

The Second District Court of Appeals has characterized the commissioner's report in a partition action to be akin to a magistrate's decision. See *McGill v. Roush*, 87 Ohio App.3d 66, 77, [6]21 N.E.2d 585 (2d Dist. 1993). Given this characterization, the Court will give the parties the opportunity to file written objections to Commissioner Simpson's report.

{¶ 26} The Commissioner's report is attached to the "Journal Entry." The first page of the report provides:

On March 1[,] 2016, I physically viewed the five parcels owned by Susan C. Simon Etal, [sic] Further described in the attached Legal Description, being case number 2014 C.V. 131, in the Champaign County Common Pleas Court.

The purpose of this viewing is to determine if it is possible to equally divide the five parcels into four equal parts.

The five parcels are approximately 2 to 4 miles apart.

A parcel on Old Troy Pike is Parcel Number G22-07-11-09-00-016-00, consisting of approximately 25.05 acres, more or less. Most of which is tillable. This is a highly productive parcel of farm land, with a good

natural drainage.

Two parcels on State Route 560, being Parcel Number G22-07-11-09-00-001-01 with approximately 1.362 acre[s], more or less. This parcel has no road frontage. Parcel [N]umber G22-07-11-10-00-008-01 has approximately 5.352 acres, more or less with road frontage.

The two parcels join and are tree covered and may be in a flood zone. A surveyor could determine if these[] parcels are in a flood zone.

Land on Eris Road consists of two parcels.

One being parcel number G21-07-11-24-00-014-000 which is approximately 105.22 acres more or less.

The other parcel on Eris Road is parcel number G21-07-11-18-00-009-00 and is 10 acres, more or less.

The parcels join. Of this acreage, approximately 55 acres is tillable, according to the Champaign County FSA Office.

This farm lays in an L shape.

There is an old, two story house and various out buildings on the site.

There is also a mobile home on the site.

Some of the subject land is very rolling and classified as Highly Erosive. Due to the distance between the five parcels and the difference in production potential and the small amount of road frontage of the [Eris] Road parcels, it is my opinion, that I cannot divide the subject land into four equal parcels.

**{¶ 27}** On the following page, a "Letter of Transmittal" provides that the Eris Road

parcels have an estimated market value of $490,000.00; that the vacant land on State Route 560 has an estimated market value of $16,500.00; and that the parcel on Old Troy Pike has an estimated market value of $230,000.00. All estimated values are as of March 8, 2016.

{¶ 28} Regarding the property on Old Troy Pike, the report provides as follows:

The subject lays in one field.

The topography is mostly level.

The soil type is Fox Silt. This is a highly productive soil type and has a good natural drainage.

This subject is a very desirable parcel of land.

There are no signs of development in the immediate subject area.

Due to this fact, I see no reason to believe there will be a land use change in the near future.

{¶ 29} The land appraisal report for the property on State Route 560 provides: "The subject is in a flood zone. None of the comparables are in a flood zone. It is my opinion [d]ue to this fact * * * an adjustment should be made as to value. Due to the fact a potential home builder would have the expense of flood insurance."

{¶ 30} Regarding the Eris Road property, the Report provides:

The subject has two dwellings.

One is an old, one and half story single family residence.

This house appears to be in a fair condition.

The residence has two types of siding.

The roof appears to be in good condition.

An old bank barn is in a fair to poor condition and does not meet today[']s modern farming practices.

An attached lean[-]to on this bank barn is used to store equipment.

Two, small grain bins are on the site.

Other small out buildings contribute no value, in my opinion.

An old, mobile home on a concrete foundation is also on this site.

The subject land shows much deferred maintenance.

The fence rows are over grown with trees.

The open ditches are also over grown with trees and need to be cleared to work better.

Much of the tillable land is classified as Highly Erosive.

There are no sod water ways in place for drainage.

Many areas of the tillable land show[] erosion taking place.

The fields are sm[a]ll which makes it difficult to operate modern farm machinery in the acreage.

Much of the subject farm is wooded and there is not very much road frontage.

**{¶ 31}** The attached appraisal report for the Eris Road property provide: "This appraisal is of the real estate and improvements only. No personal property is included in the estimated value of the subject."

**{¶ 32}** On April 21, 2016, the "Objections of Defendants Jay A. Underwood and John J. Underwood to the Report of Commissioner Jerry L. Simpson" were filed. The brothers objected as follows:

1. The Commissioner's Report over-states the value of the subject real estate by failing to deduct, therefrom, the value of Defendant John J. Underwood's personal property and improvements, including a mobile home, water well, and septic system.

2. The Commissioner's Report includes an appraisal of the subject real estate in fee simple, but does not arrive at a value for the life tenants' estates. See R.C. § 5307.09 (stating that "the commissioner . . . shall return . . . to the court of common pleas [ ] a just valuation of the estate"). Defendants reserve the right to object to such value when it is established. In its Entry dated February 23, 2016, the Court stated that the fee simple valuation established by Commissioner Simpson will be used to calculate "the value of the co-life tenants' interests in the Property." It may be appropriate for the parties to submit briefs setting forth the proposed methodologies for valuing the life estate.

3. The Commissioner's Report fails to set forth a plan for equitably dividing the farm or a finding that it cannot be divided "without manifest injury to its value" as required by R.C. § 5307.09. See *McGill v. Roush*, 87 Ohio App.3d 66, 75 (Second Dist. 1993) (stating that a commissioner has a "duty to explore every reasonable possibility of equitably dividing the property"). Defendants have previously put forth, to Plaintiffs, a plan for dividing approximately 43 acres of property occupied by Defendant John J. Underwood from the balance of the farm and believe that such division can be made without causing "manifest injury." Further, such division will

simplify these proceedings and obviate the need for the Court to determine the ownership and value of improvements constructed on the premises by Defendant John J. Underwood.

Defendants respectfully request that the Court schedule a conference and/or an evidentiary hearing to resolve the issues identified above.

{¶ 33} On April 28, 2016, a "Memorandum Contra of Plaintiffs' [sic] to Defendant Jay A. Underwood and John J. Underwood's Objections to Report of Commissioner Jerry L. Simpson" was filed. After noting that they requested the appraisal be reduced based upon the value of John's personal property and improvements to the Property, the sisters asserted that they did not object to reducing the appraisal if the brothers "can produce a sworn statement identifying which items are his personal property, were not constructed for the benefit of the family partnership, and/or provide evidence of ownership, all of which can then be provided to the Commissioner."

{¶ 34} Regarding the valuation of the life estates, the sisters asserted that briefing "different methodologies is unnecessary as the valuation only establishes a price at which the parties can exercise their respective right to elect to purchase the property." The sisters further asserted that "R.C. 5307.06 states once the Commissioner's report is approved, one or more of the parties can elect to take the property at the appraised value. If none of the parties elect to purchase, pursuant to R.C. 5307.11, the property can be sold at auction." The sisters argued that, in the event of an auction, the "auction will determine the true value of the life estates."

{¶ 35} Finally, the sisters noted that "Defendants propose to physically partition

part of the farm and assign it to one of the life tenants, Defendant John Underwood," a proposal the sisters asserted "fails for numerous reasons." The sisters argued that after Defendants' objections, they "are only requesting the partitioning of the four (4) life estates. Therefore, as soon as the first life tenant passes, the three remaining life tenants will be back to this court again requesting partition of the property into thirds and Defendants' proposal provides no finality." Further, the sisters argued, "Defendants' plan offers no plan to distribute the rest of the property amongst the remaining life tenants. Although Defendant John Underwood can identify what he wants from the farm, there are three (3) others that need to be equally compensated." The sisters argued that they have "previously offered to physically partition the property. However, Defendants have rejected these offers as they want to trim off the choice parts of the farm for themselves and dump the carcass on the Plaintiffs." The sisters asserted that "the value of the farm is as a single operational farm." They argued that "Defendants' proposal does not result in a single claim being resolved or party being dismissed," contrary to Defendants' assertion that "division would simplify these proceedings." The sisters indicated that "there is no need for a conference or evidentiary hearing as they have acquiesced to two of Defendants' objections and third objection requesting the property be physically partitioned is impossible and impractical."

{¶ 36} The trial court scheduled a hearing on the brothers' objections to the Commissioner's report for May 18, 2016. At the hearing, Jerry Simpson testified that he is a self-employed real estate appraiser, licensed for residential real estate in the State of Ohio. He stated that he has experience appraising agricultural properties, and that he "quit farming in 1986. I've been appraising full-time since then." Simpson stated that

pursuant to the court's request, he inspected the subject properties on March 1, 2016. Simpson testified that he concluded that they could not be equitably divided, and that he sent correspondence to the court expressing his conclusion.

**{¶ 37}** Simpson identified his report and correspondence. Simpson stated that he returned to the properties on March 8, 2016, and thereafter submitted appraisals to the court. He identified three appraisal reports that he completed after his second visit to the properties. The following exchange occurred on direct examination:

Q. * * * What do you understand all of your obligations as Commissioner to be?

A. My understanding from what was expected of me as Commissioner was, one, see if it could be physically divided equally. And if it could have been, well, I was supposed to go ahead and do it.

I felt that I - - I didn't think it could be done the way they were laid out. So then my obligation after that was to go ahead and appraise each of the three parcels.

* * *

Q. Other than going out and taking a look at the property, what did you do to determine that * * * the Underwood property in the instant case, cannot be equitably divided?

A. It lays in three different places. Each place has different characteristics.

Q. Any other factors you considered?

A. That was my main factor. Another one was the main farm on

Eris Road which laid in an L shape. It limited the amount of frontage.

{¶ 38} Simpson stated that there are actually five parcels in the Property, and that some of them are "contingent." He stated that altogether the Property is comprised of about 147 acres. The following exchange occurred:

Q. My question was, are all of the factors and facts that you considered in reaching your conclusion that the property can't be equitably divided are all of those set forth in this letter to the court that is the second page of defendant's Exhibit A?

A. Yes. Yes.

Q. I noticed that in that letter it does not include a conclusion that the property cannot be divided without manifest injury to its value. Did you reach such a conclusion?

A. Yeah. Yes. It could damage the value because mainly on the Eris Road property.

Q. In what way may it damage the value?

A. You would have to chop it up. So that it would just make it very difficult to farm. And there would be - - it was very limited road frontage. So no parcel would have much frontage at all. It would just be a chopped up mess if you tried to divide it. It would be something that would be harder to sell. I'll put it that way.

Q. Did you reach any - - did you do any calculation or reach any sort of determination of the amount of injury to the value that might occur if you divided the property?

A. No, sir, I didn't.

Q. Did you set out any alternatives for physically dividing the property?

A. No.

Q. So, for example, you never considered dividing the 115 acre parcel on Eris Road into two pieces?

A. No, I didn't.

Q. And you didn't formulate any plan for dividing any of the other properties; is that correct?

A. No.

Q. Why did you decide not to consider any of those alternatives?

A. They just wouldn't fit the community. It would just make the farm a mess. It would be a chopped up mess. It would be very difficult for today's farming operations. And the farm laying in an L shape made it even more difficult.

Q. Are you aware that Jeff Underwood lives on part of the property?

A. No, I didn't know he lived on the property.

Q. Do you know where the mobile home is located on the property?

A. Yes, I do.

Q. * * * And you didn't consider, did you, cutting off 40 acres of the 115 acre parcel of Eris Road where the mobile home is located, did you?

A. No.

Q. Do you know whether making such a division would manifestly

injury [sic] the value of the total property?

A.   It could.   One thing you would have to check, which I didn't, is see what your local zoning is as far as frontage.

Q.   You didn't consider the local zoning?

A.   No.

Q.   Are you aware that the property at issue here is owned by four life tenants and 13 remaindermen?

A.   Yes, I was aware of the four.

Q.   * * * Do you have any experience in determining the value of life estate interests?

A.   Life estate interests, no.   I've never done anything like that.

Q.   And your report in this case doesn't arrive at a value of the life estate; is that correct?

A.   No.   I'm doing market value for the properties.

{¶ 39} Simpson stated that in reaching a conclusion about the fair market value of the properties, he included the value of the mobile home.   He stated that he attributed the depreciated value of $13,895.00 for the mobile home in the appraisal of the Eris Road parcel.   He stated that he included the mobile home "since they considered it.   Now, this mobile home appeared to be sitting on a permanent foundation of some kind.   And it looked like it was being taxed as real estate.   But it's still a mobile home."   Simpson further stated that he included in the appraisal of the Eris Road parcel the value of the well and septic system, attributing the depreciated value of $9,000.00.   He stated that he did not include a value for livestock fencing.

**{¶ 40}** On cross-examination, the following exchange occurred regarding the 6.7 acre parcel:

Q. In your appraisal you valued 6.7 acres at $16,500: is that correct?

A. Yes.

Q. And can you give me an idea why you valued it at $16,500?

A. A normal six-acre parcel sitting out in the country like that with a few trees is a very desirable building site. But this one is in a flood zone. The whole thing. And if anyone builds there, they would have to pay flood insurance for the entire time of the loan, which costs a lot of money. So in my opinion, that is an adverse affect on the market value of the property.

Q. That is residential use; is that correct?

A. Yes.

Q. What about agricultural use?

A. It doesn't have the affect [sic]. But the way the thing is laid out, it wouldn't be a good five-acre parcel to farm.

Q. But could it be converted to an agricultural use?

A. It could be by going in and removing - - all tree and brush cover it right now.

Q. And if that improvement was made could your evaluation of the 6.7 acres increase?

A. It probably would have increased a little. Being a small parcel that is always going to set the agricultural value.

{¶ 41} John Underwood testified that he has resided at 770 Eris Road in the mobile home on the property "someplace around 30 some years."   He stated that the property where the mobile home is located is part of the 115-acre parcel.   John stated that he paid for the mobile home, and he identified the title thereto, in his name, reflecting that he purchased the home in 1982. He further identified a Champaign County tax bill for the mobile home.   John stated that he pays the taxes on the mobile home, and that the UFP does not.

{¶ 42} John further identified an exhibit which he testified reflects "just the stuff that I've spent" at 770 Eris Road installing a well on July 25, 2012.   Additionally, John testified that he "spent most of my time clearing brush and cleaning up dead stuff.   Trees.   Just keeping up the lane. Just keeping stuff mowed up."   John stated that he installed a septic system in 2011, as well as some fencing.

{¶ 43} The following exchange occurred:

Q.   Now, the property where your mobile home is located is part of the 115 acre parcel; is that correct?

A.   Yes.

Q.   And you rent part of that parcel or have rented part of that parcel from the partnership; is that correct?

A.   Yes.

Q.   How many acres do you rent?

A.   30.

Q.   And who rents the rest of it?

A.   Jay, my brother.

Q.  * * * So even now the 115 acres is divided into two rental units; is that correct?

A. Yes.

Q.  Can the - - do you believe that the part of the parcel where you live can be physically divided off of the 115 acres?

A.  Yes.

{¶ 44} On cross-examination, John testified that the UFP paid the property taxes on the land where his mobile home is located.   When asked how much rent he has paid to the UFP "since 2007 for placing your mobile home on the partnership on the land," John responded, "[n]one."   When asked if he made improvements, including the well and the septic system, in exchange for free rent, John responded, "Nobody brought up the question until now."

{¶ 45} John testified that he signed an agreement with the UFP to take responsibility for the "lane" on the property.   John stated that he believes the 115 acres can be divided. The following exchange occurred:

Q.  What is your plan?

A.  From the center of the lane just back to the fence to the end of the property.

THE COURT:   Center of the lane to what?

THE WITNESS:   To the end of the property to the west.   To the west end line.

Q. So your goal is to take from the center to [sic] the lane, one side of yours.   And the other approximately 72 acres, what will happen to that?

A.   Whoever wants it.   If Jay doesn't and if you guys don't sell it I guess.

Q.   The center of the lane is the only access point to the 72 acres; is that correct?

A.   Yes.

Q.   So if you were to take the center of the lane over for your 43 acres, whoever would take that 72 acres would have to enter into an agreement with you to access their land, correct?

A.   Yes.

Q. * * * And how would that lane be maintained?   Who would pay for it?

A.   Whomever owns it.   Half of it would just take care of half and then I'd take care of the other half.

Q.   So under your proposal whoever owns the 72 acres left over after you take your 43 acres would have to share in the maintenance and upkeep of the lane?

A.   Yes.

Q.   And they would also share ownership of the lane?

A.   Yes.

Q.   Under your plan are you taking your 43 acres as a life estate?

A.   Yes.

* * *

Q.   Under your plan or proposal what happens if you pass away

first?

A. Then it goes to the other folks. Or Susan and Jay and Sara.

Q. So the entire property, the 115 acres plus the 32 on Old Troy Pike, would have to be divided three ways at that time; is that correct?

A. I suppose.

* * *

Q. So every time a life tenant would pass away you would have to come back to the court and file a petition action; is that your understanding?

A. I don't understand that stuff. Not that much yet.

* * *

Q. Are you aware that the Plaintiffs have made a proposal whereby you and your brother would take the 115 acre property on Eris Road for the rest of your lives and your sisters would take approximately 32 acres on Old Troy Pike for the rest of their lives?

A. Yes.

Q. What is wrong with that plan?

A. Well, I don't really know at this present time.

Q. But you would be getting the 43 acres you want; is that correct?

A. Uh-huh.

Q. And then your brother and you would own the whole 115 acres for the rest of your lives. And then if one of you were to pass, it would go to the other one. So you would never be disturbed from your property.

A. It would just have to be discussed between me and Jay.

Q. And without revealing any sort of confidences, do you understand that if you and your brother would take that 115 acre parcel, you and your brother could work out some sort of accommodation as to how you owned your 43 acres?

A. Uh-huh.

Q. So you could give him $100 every month. Or he could pay you for renting one of the fields on your 43 acres.

A. Uh-huh.

{¶ 46} On redirect examination, the following exchange occurred:

Q. Following up on Mr. Simon's question about proposals that have been discussed, is it your understanding as well that we have proposed to Plaintiffs that you would take the 43 acre parcel, they would take the balance of the 115 acre parcel, and Jay would take the 25 acre parcel? Do you recall making that proposal?

A. Yes.

Q. And do you understand that they rejected that proposal?

A. Yes, sir.

{¶ 47} On re-cross-examination, the following exchange occurred:

Q. The proposal that he was just speaking of whereby the Plaintiffs would receive the 72 remaining acres of the 115 acre parcel, do you recall talking to your Counsel just now?

A. Yes.

Q. Under that proposal the Plaintiffs would have to share a lane

with you; is that correct?

 A. Yes.

 Q. They would have to share an easement with you; is that correct?

 A. That's correct.

 Q. And share maintenance of the property of the lane; is that correct? Of the lane?

 A. Yes.

**{¶ 48}** The following exchange occurred on redirect examination:

 Q. If you are to divide the property, divide 115 acres into 43 acres and 72 acres approximately, the 72 acre parcel isn't landlocked, is it?

 A. No.

 Q. It has frontage, correct?

 A. Yes.

 Q. Where a driveway could be constructed.

 A. Yes.

**{¶ 49}** At the conclusion of the hearing, the court asked counsel for the brothers if they disputed the Commissioner's testimony that the mobile home is affixed to a permanent foundation. After conferring with John, counsel indicated, "I understand the unit is affixed to the foundation with hurricane straps. There are no wheels on the unit, but it could be picked up and moved."

**{¶ 50}** Also at the conclusion of the hearing, the following exchange occurred between the court and counsel for the brothers:

 THE COURT: * * *

How does Defendant propose that the Commissioner is to value a life estate?

MR. FLAX: Well, Your Honor, there is a methodology. I think it's intended to apply to charitable and remainder trust and internal revenue code. We've done some preliminary calculations. It takes into account the ages of the - -it takes into account the ages of each of the life tenants. And based on the appraised value of the property, as reported by Mr. Simpson, the life estate values under that formula would range from 50 to $57,000.

So Jeff Underwood is the youngest. His life estate would have the greatest value. And Susan, I believe, is the oldest and her life estate would have the least. But the range is 50 to $57,000 based on that methodology. * * *

{¶ 51} On May 31, 2016 a "Status of Settlement Discussions" was filed by counsel for the sisters that provides:

Following the hearing on Defendants' *Objections of Defendants Jay A. Underwood and John J. Underwood to the Report of Commissioner Jerry L. Simpson*, the parties met to discuss settlement. Plaintiffs offered several options for settlement including an offer to purchase the property from Defendants for an amount **higher** than Defendants' offer. Defendants declined said offer. Defendants refused Plaintiffs' offers to physically partition the Property or to simply sell or buy the parties' respective life estates and avoid the need to go through the timely and expensive partition

process.    At this time, Plaintiffs believe settlement is highly unlikely.

{¶ 52} On June 15, 2016, "Plaintiffs' Partial Motion for Summary Judgment to Dissolve Partnership" was filed.    Citing R.C. 1776.61, the sisters argued that the UFP "no longer has any economic purpose or function.    Originally the Partnership collected rents from Defendants and paid the insurance and taxes on the Property and for the Partnership.    However, since Defendants have not paid for the use of the Property since 2013, the Partnership has had no income."    The sisters further asserted that "the Partnership is not a practical vehicle through which to carry on the Partnership's business. As set forth above, Defendants have usurped any and all purpose of the Partnership by keeping for themselves all income derived from the Property and assuming all expenses." Finally, the sisters argued that "even if Defendants relinquished control over the profits and expenses of the Property, the management of the Partnership has been deadlocked on all major issues since 2013."

{¶ 53}    In its decision in favor of the sisters, the trial court addressed the availability of the remedy of partition, the Commissioner's failure to set forth a plan of partition, the valuation of the Property in fee simple, and the valuation of the life estates.    Regarding the remedy of partition, the court noted that "the life estate is the only interest in the Property that can be partitioned at this time.    In order to obtain partition, the plaintiff must have both title to some part of the realty and an immediate right to possession." According to the court, "the life estate prevents the remaindermen from seeking partition since they lack an immediate right to possess the Property."    The court further noted in a footnote that the number of remaindermen is uncertain, since "survivorship of the last life tenant, or predeceasing said individual with issue, is a condition of taking possession

* * *.   The actual number of grandchildren surviving the last life tenant (i.e., remaindermen) may be more or less than the present number of thirteen."

{¶ 54} The court determined that partition "is also dependent upon common ownership of the realty," and that a "life tenant cannot compel the remaindermen to suffer partition of their interests.   Nor can a remainderman have partition where there is an outstanding life estate."

{¶ 55} The court noted that partition is not only available to holders of a fee simple interest.   According to the court, the "only requirement is co-tenancy with an immediate right to possess the premises.   Thus, an owner for life of an undivided interest in real property may compel partition, but the decree will be limited to partition of the life estate." The court concluded that if tenants in common have "a legal right in an estate and request[] a partition, the court must grant the request," and the fact that "another partition action will likely be filed within a generation does not constitute sufficient grounds to refuse partition."   The court therefore rejected the brothers' "assertion that their sisters should be denied partition."

{¶ 56}   Regarding the Commissioner's failure to set forth a partition plan, the court noted that the borthers' arguments were "focused primarily on the 115 acres located on Eris Road." The court determined as follows:

> Commissioners are not required to offer a plan of partition if they have made a good faith effort to make a most equitable partition but find they cannot. * * * In such situations, the commissioner's report must provide a sufficient factual basis for concluding that an equitable division of the property is not possible. * * *

With regard to Eris Road, Commissioner Simpson stated in his report that "the fields are small which makes it difficult to operate modern farm machinery in the acreage." He also observes that only 55 of 115 acres are tillable and that much of this land is highly erosive and shows signs of erosion in some areas.

* * *

While the Underwood brothers dispute whether Eris Road can be equitably divided, they do not dispute Commissioner Simpson's characterization of the land. They do not dispute his conclusion that only 55 of the 115 acres are tillable land. Nor do they dispute his observation the fields are small and subject to erosion. The brothers are also silent regarding the commissioner's statement that Eris Road shows deferred maintenance, including overgrown fence rows and drainage ditches.

If Eris Road was the only tract under consideration, the Court would readily agree with Commissioner Simpson that partitioning this property among the four siblings would cause manifest injury to its value. Eris Road has a variety of uses scattered throughout its 115 acres, with only 55 tillable acres. Splitting the tract among the Underwood siblings would result in fields too small for modern farming practices. The Court would also find that the State Route 560 tract cannot be partitioned, due to its small size and limited utility. * * * While no inquiry was made regarding the Old Troy Pike tract at the objections hearing, splitting the 25 acres into four smaller fields, approximately six acres in size, might make modern farming methods more

difficult, not unlike the Eris Road situation.

Ohio law, however, favors partition of the subject realty over its sale. * * * Furthermore, the partition statute allows multiple tracts to be partitioned in a single action and also allows the commissioner to make a global division of the property where, as in this case, the interested parties own the same percentage in each tract subject to partition. * * *

In apparent reliance on this provision, the Underwood brothers have proposed assigning the 43 acres currently occupied by John Underwood to him as his portion of the life estate. Jay Underwood would be assigned the State Route 560 and Old Troy Pike tracts in their entirety, with the sisters splitting the remaining 72 acres of Eris Road. * * * The brothers further claim that any inequality resulting from the division can be remedied by an award of owelty. [Footnote omitted.]

The Underwood sisters characterize their brothers' proposed division as an attempt "to trim off the choice parts of the farm for themselves and dump the carcass on [them]." * * * The sisters also contend that the proposal is incomplete and made solely [for the purpose] of further delaying these proceedings. * * *

* * *

While R.C. 5307.07 allows commissioners to make a global division, instead of simply assigning to each interested party their respective interest in each tract, the statute does not mandate consideration of such divisions. * * * Thus, Commissioner Simpson had the discretion to make a global

division of the Property but was not required to do so.

Finding that R.C. 5307.07 requires consideration of global divisions could also have the effect of needlessly delaying resolution of partition actions. For example, if Commissioner Simpson were to find that the 43-72 split proposed for Eris Road would cause manifest injury to the value of the Property, the Underwood brothers could respond with yet another proposal. As was mentioned at the objections hearing, an infinite number of partitions are possible when the interested parties own the same percentage of multiple tracts, as in this case.

There is also significant reason to believe that the Underwood brothers' proposed division is not equitable and works to the detriment of their sisters. For example, the only access to the 72 acres is a lane that passes over the acreage that would be retained by John Underwood. If the sisters want to use this lane, they would have to secure an easement from John Underwood, in order to reach their property and would also have to contribute to its upkeep. * * * In the alternative, the sisters could construct a lane across their 72 acres, further reducing the usable acreage awarded to them. * * *

Other aspects of the proposal call into question whether the proposed distribution is equitable. As mentioned previously, Jay Underwood would receive the Old Troy Pike and State Route 560 parcels under this proposal. Yet the fee value of these parcels, as determined by Commissioner Simpson, is $246,500.00 ($230,000.00 + $16,500.00),

slightly more than one-third the value of the Property as a whole.

There is also evidence that supports * * * the Underwood sisters' characterization of the remaining 72 acres as "the carcass." John Underwood testified this acreage would run from the center of the existing lane to the end of the property to the west. * * * Commissioner Simpson has incorporated in his report an aerial photograph depicting the likelihood of soil erosion. This photograph, taken by the Farm Service Agency during the 2014 crop year, shows that much of the western part of Eris Road – the portion to be awarded to the sisters – is wooded and less valuable on a per acre basis than the land retained by John Underwood. [Footnote omitted]. Also, the Old Troy Pike and State Route 560 parcels that would be assigned to Jay Underwood represent one-third of the Property's value, further reason to agree with the sisters' characterization of the proposed division.

Nor would an award of owelty to the Underwood sisters remedy these inequities. * * * In this case, the Court cannot characterize the 72 acres set aside for the Underwood sisters as slightly less equal than the acreage given to their brothers. Instead, the acreage is considerably less equal than their brothers' portions.

For these reasons, the Court agrees with Commissioner Simpson that the Property cannot be equitably divided among the siblings without causing manifest injury to its value. The Court overrules the Underwood brothers' objection that the commissioner failed to set forth a plan for equitably dividing the Property. The Court also adopts as its own the

commissioner's conclusion that the Property cannot be equitably divided [among] the siblings without causing manifest injury to its value.

{¶ 57} Regarding the valuation of the Property in fee simple, the court concluded as follows:

* * *

The Underwood brothers contend that the mobile home located on Eris Road is the personal property of John Underwood and should not have been included in the calculation of the Property's value. As support for this contention, they presented the certificate of title for the mobile home * * * and the current manufactured homes tax bill for this home at the objections hearing.

A manufactured home is generally considered personal property, unless it is affixed to real property. Once a manufactured home is affixed to personal property, Ohio law treats it as a fixture that is part of the real estate. * * * Three elements [must] be shown before a chattel will be considered a fixture: (1) the chattel must be annexed to the realty to some extent; (2) the chattel must be appropriate for the purpose of the realty to which it is attached; and (3) the party making the annexation must intend to make the chattel a permanent part of the realty. * * *.

The tax classification of a manufactured home does not control whether it is or is not a fixture. Surrender of the certificate of title is not a necessary prerequisite to a valid fixture being created in the home. * * * Ohio law distinguishes between classification for tax purposes and common

law fixture analysis. * * *

The record contains ample evidence that John Underwood intended to make * * * the mobile home a permanent part of the Eris Road property. Commissioner Simpson testified at the objections hearing that the mobile home sat on a permanent foundation. The commissioner's report also mentions that an addition had been made to the home. John Underwood confirmed that the home is affixed to the foundation with hurricane straps and that its wheels have been removed. He also testified that he purchased the mobile home in 1982 and that he has lived in the home for at least 30 years. * * * He also installed a new septic system in 2011 and a new well in 2012. * * * These expenditures are further evidence of John Underwood's intent to make the mobile home a permanent part of the realty.

The facts of this case are similar to those present in *Morris v. Dickinson County Bank (In re Moore)*, Bank. D. Kan. 09-11051 (Adversary No. 09-5157), * * *. In *Morris*, a mobile home sitting on concrete piers and securely strapped to the ground was found to be a fixture. The home, like the one occupied by John Underwood, was permanently attached to electricity, water, propane, and a septic system. A mud room had been added to the Kansas structure, not unlike the addition noted by Commissioner Simpson in his report.

The Court finds that the mobile home should be classified as a fixture, given John Underwood's obvious intent to make the structure a permanent part of the Eris Road property. The well and septic system

should also be classified as "fixtures" since they allow the mobile home to function as a permanent residence. Since the mobile home, well, and septic system are fixtures, Commissioner Simpson properly included them in the valuation of Eris Road.

A life tenant who makes improvements with knowledge of his title is presumed to have made those improvements for his benefit. Thus, a life tenant has no right to recover the cost of an improvement from the remaindermen, unless ordered by a governmental entity. * * * If a life tenant has no right to recover the cost of improvements from the remaindermen, it follows that these costs cannot be deducted from the value of the fee since the fee is vested in the remaindermen, not the life tenant. * * *.

A trial court, during partition proceedings, may reimburse a cotenant for improvements even if they were made without the consent of the other cotenants, in order to avoid unjust enrichment. * * * The right to an accounting for improvements is secondary to and dependent on the right to partition. * * *

The Court therefore finds that Commissioner Simpson properly included the improvements made to Eris Road in his calculation of the tract's value, in fee simple. The Court overrules the Underwood brothers' objection that the commissioner overstated the fee simpl[e] value of the Property, by including these improvements. The Court defers consideration of whether John Underwood's siblings should reimburse him for these improvements until an election or sale of the Property takes place.

**{¶ 58}** Regarding the valuation of the life estates, the court determined as follows:

In situations where the estate cannot be divided without manifest injury to its value, the commissioner or commissioners shall return that fact to the court of common pleas with a just valuation of the estate. R.C. 5307.09. The Underwood brothers contend that Commissioner Simpson should have determined the value of the life estate, in accordance with R.C. 5307.09, instead of determining the value of the fee.

The Fourth District Court of Appeals has discussed at length the inherent difficulty of valuing life estates [as follows],

It is virtually impossible to precisely value a life interest in real estate. The most that can be done is to approximate the value by taking into account all contingencies and surrounding circumstances including similar or comparable land value and life expectancy. The difficulty in valuing life estates is readily seen in its historical treatment. One old common law rule computed the value of a life interest by simply assigning it one-third the value of the fee. Another rule valued life estates at "seven years' purchase of the fee." The more modern practice is to estimate the value of a life estate with reference to the life tenant's life expectancy as shown by recognized mortality tables. *Cook v. Ohio Dep't of Job & Family Servs.,* 4th Dist. Jackson No. 02CA22, 2003-Ohio-3479, ¶ 16 (internal citations omitted). In this case, there are four life tenants, who range in age from 60 to 64 years, further complicating the valuation process.

For these reasons, the Court directed Commissioner Simpson to

provide a just valuation of the fee simple interest of the Property, with the expectation that this figure would be used by the Court and the parties to determine the value of the co-life tenants' interests in the Property.

The Underwood sisters have also indicated that they do not object to the utilization of their brothers' preferred method of valuing the life estates. * * *. At the objections hearing, counsel for [the] Underwood brothers stated that each sibling's interest in the life estate is worth between $50,000.00 and $57,000.00, based upon the fee value of $736,500.00. [footnote omitted.] The sisters' willingness to use their brothers' methodology is further reason to overrule any objection that the commissioner should have reported the value of the life estate, not the value of the fee.

The Court therefore overrules the Underwood brothers' objection that Commissioner Simpson should have determined the value of the life estate, instead of the value of the fee.

{¶ 59} The court concluded that "Commissioner Simpson's report and testimony amply support his conclusion that the Property cannot be equitably divided among the Underwood siblings. The record also supports the commissioner's valuation of the Property, in fee simple, at $736,500.00." The court adopted the commissioner's report and determined that "the siblings' interest in the Property shall be sold, unless one or more sibling[s] exercises their right of election."

{¶ 60} Finally, the court determined as follows:

The court **ORDERS** the Underwood brothers to file and serve their

valuation of the life estate, including the calculations used to arrive at those amounts, by **Friday, July 15, 2016.** These valuations shall use the commissioner's assessment that the Property, in fee simple, is worth $736,500.00. The sisters will be given until **Monday, July 25, 2016** to file and serve any objections. If the brothers' valuations are acceptable to all parties, the Court anticipates using those numbers, for the sale or exercise of the right of election.

\* \* \*

Since adoption of the commissioner's report precludes the Underwood brothers from having their interest in the Property set aside for them, this entry shall be designated a final appealable order. Wherefore, the Court finds that "there is no just reason why the judgment should be delayed as a final judgment." Civ.R. 54(B).

**{¶ 61}** We note that on September 28, 2016, the brothers filed a "Motion for Stay of Proceedings Pending Appeal without Bond." The motion indicates that the brothers were granted a stay by the trial court on the condition that they post a $20,000.00 supersedeas bond, and that they "believe it was error to require a bond." On October 18, 2016, this Court overruled the motion, noting that "[w]e decline to modify the trial court's decision to grant a stay upon the posting of a $20,000.00 bond."

**{¶ 62}** The brothers assert three assignments of error herein. Regarding their first assigned error, in the "Assignments of Error" section of their brief, the brothers assert the following first assignment of error:

THE TRIAL COURT ERRED BY ADOPTING THE

COMMISSIONER'S REPORT DATED APRIL 7, 2016. THE COMMISSIONER'S REPORT FAILED TO CONSIDER ALL POSSIBLE ALTERNATIVES TO SALE OF THE FAMILY FARM, AND FAILED TO PROVIDE A FACTUAL ANALYSIS AS TO WHY PHYSICAL PARTITION WAS IMPOSSIBLE WITHOUT CAUSING MANIFEST INJURY TO THE FAMILY FARM AS REQUIRED BY R.C. § 5307.09.

{¶ 63} In the "Argument" section of their brief, the brothers assert the following first assignment of error:

THE TRIAL COURT ERRED BY ACCEPTING THE COMMISSIONER'S REPORT DATED APRIL 7, 2016. THE COMMISSIONER'S REPORT WAS DEFICIENT IN THAT IT DID NOT MEET THE STANDARDS SET FORTH IN R.C. § 5307.09.

{¶ 64} In the body of their brief, the brothers argue as follows:

* * *

In the case at bar, the trial court should not have accepted the Commissioner's Report, as no factual analysis or basis upon which the Commissioner based his determination was included. The Commissioner failed to consider "all possible alternatives" and simply jumped to the conclusion that the Family Farm could not be partitioned. Given the serious deficiencies in the Commissioner's Report, the trial court had no way of determining whether the requirements of R.C. § 5307 *et seq.* had been satisfied by the Commissioner.

When the Commissioner was asked about the process and

methodology he used in coming to his recommendation, the Commissioner testified that he did not consider splitting off parcels to partition the property, did not consider local zoning requirements, did not consider the value of the life estates and did not do any calculations regarding how the value of the property might be diminished if it was partitioned.

The Commissioner's only statement in the Report regarding partition of the property was that he "cannot divide the subject land into four equal parts". * * * The Commissioner did not provide any factual analysis as to why he came to that conclusion as required by Ohio law. * * * Ohio law does not require that the partition recommended by the commissioner be perfectly equitable. Rather, "it is up to the trial court, not the commissioners, to produce true equity in partition, since the commissioners' report is advisory and subject to court approval." * * *

{¶ 65} The Appellees assert that the "Commissioner made a good faith effort to partition the Property, but there is no way to physically divide this family farm into four sections based on the lack of frontage, the inconsistent and varying nature and uses of the land, and the physical location of the parcels." Regarding the proposed partition by the brothers, Appellees assert that under "this proposal the Appellees would take for their share the scraps of land remaining after most of the tillable fields had been taken. Not only would such land be landlocked, not surprisingly, these are the same acres that have not been maintained or improved over time." Appellees note the trial court's determination that "Appellant's proposal would provide to Appellant Jay Underwood over one-third of the appraised value of the entire Property for his single life estate interest."

Appellees argue that if all they "were to receive was this landlocked 72 acre tract and owelty, the amount of owelty would be almost equal to the value of an entire life estate interest." Appellees assert that "Appellants' 'plan' for physical partition fails to resolve issues relating to access, the expense of the physical division, or what would happen upon the passing of the first life tenant."

{¶ 66} As this Court has previously noted, an "action for partition is equitable in nature, but it is controlled by statute." *Thrasher v. Watts*, 193 Ohio App.3d 569, 2011-Ohio-2844, 952 N.E.2d 1207, ¶ 24 (2d Dist.), citing *McGill v. Roush*, 87 Ohio App.3d 66, 79, 621 N.E.2d 865 (2d Dist. 1993). As this Court further noted in *McGill*, at pgs. *80-81:

> The right of partition, whether under statute or in equity, is remedial
> and should be liberally construed. *Black v. Sylvania Producing Co.* (1922),
> 105 Ohio St.346, 137 N.E. 904. "Since the partition of property is to be
> favored over the sale of property, when a party objects to a commissioner's
> report, that party should have a right to a hearing to contest the
> commissioner's findings before the property is appraised and subsequently
> sold." [*Stiles v. Stiles*, 3d Dist. Auglaize No. 2-89-3, 1991 WL 82894, *3
> (May 10, 1991)].

{¶ 67} R.C. 5307.6 governs the duty of commissioners in making partition. It provides: "In making a partition, the commissioner * * * shall view and examine the estate and, on their oaths and having due regard to the improvements, situation, and quality of the different parts, set it apart in lots that will be most advantageous and equitable." R.C. 5307.07 governs the partition of more than one tract of land and provides: "When partition of more than one tract is demanded, the commissioner * * * shall set off to each plaintiff

or interested party the plaintiff's or interested party's proper proportion in each of the several tracts unless the tracts are owned by the same proprietors in like proportion in each tract, in which case the share of any proprietor, in all the tracts, may be set off to the proprietor according to the best discretion of the commissioner * * *."   R.C. 5307.09 governs the commissioner's duty to appraise land when the commissioner cannot divide it and provides:   "When the commissioner * * * is of the opinion that the estate cannot be divided according to the demand of the writ of partition without manifest injury to its value, the commissioner * * * shall return that fact to the court of common pleas with a just valuation of the estate."   R.C. 5307.09 further provides that if "the court approves the return and if one or more of the parties elects to take the estate at its appraised value, it shall be adjudged to them, upon their paying to other parties their proportion of its appraised value, according to their respective rights *   * *."

{¶ 68}   As this Court noted in *McGill* (footnotes omitted):

R.C. 5307.06 has been construed as creating "a mandatory duty" on commissioners to "come forward with a plan for the division of the property," and if the commissioners "remain of the opinion that the division will damage the value," they must "be prepared to state the facts upon which their opinions are based."   *Hendrix v. Hendrix* (Aug. 26, 1981), Warren App. No. 422, unreported, 1981 WL 5176.

We agree with the reasoning of the *Hendrix* court.   However, we note that it is doubtful that there is a "mandatory" duty for commissioners to provide a plan of partition *after* the commissioners have made a good faith effort to make a most equitable partition but find that, ultimately, they

cannot. Then, a failure to provide a plan of partition to the trial court would not violate R.C. 5307.04 *et seq.*, provided that the commissioners' report contained a sufficient factual basis to allow the trial court to review the commissioners' efforts. We agree with the *Hendrix* court's holding that the commissioners must provide a factual basis for their conclusions.

It is also reasonable to consider commissioners as having responsibilities analogous to those of referees. As contemplated by Civ.R. 53(E), referee reports must contain sufficient information to enable a trial judge to render his own decision. *Loque v. Wilson* (1975), 45 Ohio App.2d 132, 74 O.O.2d 140, 341 N.E.2d 641. Because insufficient information impedes appellate analysis, the trial court cannot adopt a referee's report unless a statement showing the basis for the referee's decision is included. *Zacek v. Zacek* (1983), 11 Ohio App.3d 91, 93-94, 11 OBR 143, 145-146, 463 N.E.2d 391, 395-396. The partition power of commissioners has been characterized as "quasi-judicial." *Forest Park Properties, Inc. v. Pine* (1966), 9 Ohio App.2d 348, 355, 38 O.O.2d 427, 431, 224 N.E.2d 763, 768. Commissioners have "very large powers" in making partition. *Terrell v. Leonard* (1910), 17 C.C.(N.S.) 89, 92. However, as with referees, commissioners' powers are ultimately subject to court authority; commissioner partition reports may be rejected, modified, or approved by the trial court. An order partitioning property extinguishes a tenant's rights in the whole property, and establishes the tenant's exclusive right of ownership in the part of the property set off to him. Since it is an order

creating and extinguishing rights in specific property, it is an exercise of the judicial power, and cannot be entirely delegated to a nonjudicial officer. A judge must remain ultimately responsible for the exercise of the power of partition.

We find that in partition proceedings, commissioners must provide a sufficient factual analysis, similar to the report and recommendation provided for in Civ.R. 53(E), in order to allow the trial court to make an independent determination of the basis for the partition. Otherwise, it would be impossible for any court to discover whether R.C. 5307.06 has been complied with.

It would be sufficient for the commissioners to answer the question: why is it impossible to divide the land? They may successfully answer that question by testifying or reporting that the "assembly valuation" is "greater than the total value" of the land if divided. See *Forest Park*, *supra*, 9 Ohio App.2d at 354, 38 O.O.2d at 431, 224 N.E.2d at 768.

We observe that the commissioners cannot comply with R.C. 5307.04 *et seq.* without making some factual findings supported by calculations or the facts themselves, regarding the manifest injury resulting from a partition. The injury must be shown, not merely stated as a conclusion.

Cases of inequitable partition generally feature one of two types of injury to the land value. For example, the sum of the divided property may be less than the value of the whole. See *Forest Park, supra.* Or, the

commercial use of a property may be prevented upon any partition. See *Miller v. Rouse* (1900), 7 Ohio N.P. 300, 2 Ohio Dec. 358. In either case, it would be improper for commissioners merely to state their conclusion without showing their calculations or concrete reasons for deciding that partition is impossible.

Finding partition impossible cannot be accomplished without (1) calculating the amounts demonstrating that the land cannot be divided without the sum of its parts remaining less than the value of the whole, or (2) determining the particular reasons why a commercial operation on the land would be prevented from continuing if the land were partitioned.

\* \* \*

R.C. 5307.06 does not require the commissioners to achieve perfect equity. It is up to the trial court, not the commissioners, to produce true equity in partition, since the commissioners' report is advisory and subject to court approval. Nor does R.C. 5307.04 *et seq.* allow commissioners to choose not to make partition if the land is very difficult to divide. Instead, the commissioners are required to make partition unless there is no way to avoid manifest injury to the value of the property. R.C. 5307.09.

Ohio law favors the partition of the property over the sale of the property. *Stiles v. Stiles* (May 10, 1991), Auglaize App. No. 2893, 1991 WL 82894. The "primary object of the statute is to effect an actual division of the property amongst the owners." *Tabler v. Wiseman* (1853), 2 Ohio St. 207, 213. Because Ohio law favors partitions and because partitions

must ultimately be equitable, owelty is an important tool for a trial court to produce "perfect" equity from a "most" equitable partition by commissioners.[1]

Where commissioners make a partition which is not perfectly equitable, but the trial court finds that the partition is most equitable, under R.C. 5307.06, and adopts the commissioner's report, the trial court, acting in equity, may award an owelty to a coparcener who, in the trial court's estimate, is receiving the *slightly less equal* parcel of land. According to R.C. 5307.04 *et seq.*, the trial court may approve a partition which is "most" equitable, as provided by the commissioners, or, instead the court may use its inherent power in equity.

Equitable partition proceedings originated in the English High Court of Chancery and are, unlike partitions dealing with controverted titles, within the equitable jurisdiction of courts. See *Gay v. Parpart* (1883), 106 U.S. 679, 688-693, 1 S.Ct. 456, 463-468, 27 L.Ed. 256, 260-261. The remedy of partition, throughout the United States, is statutory, and partition is generally held to be one of the subjects of settled equitable jurisdiction. Partition, American Jurisprudence 2d (1987) 66, Partition, Section 97. At least one other jurisdiction has allowed a court sitting in equity to award owelty where the partition statute did not expressly provide for a payment of owelty. See

---

[1] "Where the common property of coparceners was not susceptible of equal partition of their several moieties, and a larger portion to one or more coparceners was agreed upon by the parties, or authorized by the court, the other coparceners to be paid therefor, such excess was known to the common law as owelty of partition." *Huseman v. Fingermeyer*, 106 Ohio St. 113, 117, 139 N.E. 862 (1922).

*Rothert v. Rothert* (1982), 109 Ill.App.3d 911, 65 Ill.Dec. 387, 441 N.E.2d 179. In *Rothert*, the Fourth District Court of Appeals in Illinois held that "the inherent power of the court sitting in equity to make such a division has long been recognized." *Rothert, Id.*, 109 Ill.App.3d at 916, 65 Ill.Dec. at 390, 441 N.E.2d at 182.

Although owelty may improve the equality of a partition, it is not applicable where commissioners provide the court with facts supporting the commissioners' conclusion that there is no way to produce even a "most" equitable partition. In that instance, or when the commissioners provide a factually based partition plan, the trial court's adoption of the commissioner's report should not be disturbed unless there is an error "apparent upon the face of the record." See *Smith v. Barber* (1836), 7 Ohio, Pt. II, 118, 122.

The general rule is that the trial court will seldom fail to approve the action of the commissioners except in the case of intentional misconduct, corruption, partiality, an exceeding of their authority, gross inequality, or the like. *Forest Park Properties, supra*, 9 Ohio App.2d at 353-354, 38 O.O.2d at 430-431, 224 N.E.2d at 767-768. And where commissioners recommend partition and the trial court so orders, the trial court's order will be affirmed unless the record shows that the partition is defective. *Kirby v. Kirby* (1895), 12 Ohio C.D. 736.

*McGill,* pgs. 75-79.

**{¶ 69}** We will first address the brothers' assertion that the trial court erred in

adopting the commissioner's report based upon the commissioner's alleged failure to provide a factual analysis as to why partition is impossible without causing manifest injury to the value of the Property. We disagree with the brothers. The court ordered partition "*[i]f* the co-life tenants' interest in the Property can be equitably divided." The commissioner indicated in his report that the "purpose" of his viewing the Property was "to determine if it is possible to equally divide the five parcels into four equal parts."

{¶ 70} The Commissioner's report provides that the parcels are not contiguous and "are approximately 2 to 4 miles apart." He testified that each parcel has "different characteristics." Specifically, the commissioner noted that the 25.05 acre parcel on Old Troy Pike is mostly tillable, highly productive farm land "with a good natural drainage." In contrast, the two smaller parcels on State Route 560, of 1.362 acres and 5.352 acres, are tree covered and in a flood zone, according to the Commissioner, and the 1.362 acre parcel has no road frontage. He testified that the State Route 560 parcel is not suited for agricultural use based upon its size. His report provides that as to residential usage, the trees and brush there would have to be removed, and "a potential home builder would have the expense of flood insurance."

{¶ 71} Regarding the L-shaped Eris Road property, the commissioner reported that 55 acres of the 115.22 are tillable, much of the property is wooded, and that "the subject land is very rolling and classified as Highly Erosive," with visible erosion in the tillable portion. He noted that "there is not very much road frontage," that the small size of the fields makes "it difficult to operate modern farm machinery in the acreage," and that the "subject land shows much deferred maintenance." The commissioner concluded that due "to the distance between the five parcels and the difference in production potential

and the small amount of road frontage of the [Eris] Road parcels, it is my opinion that I cannot divide the subject land into four equal parts."  The commissioner testified that he concluded that the property could not be divided without manifest injury to its value.  He testified that division could damage the value, especially on the Eris Road property, since "you would have to chop it up. So that would make it very difficult to farm. * * * It would just be a chopped up mess if you tried to divide it.  It would be something that would be harder to sell."

{¶ 72}  Having reviewed the record before us, we conclude that the commissioner provided a sufficient factual analysis to allow the trial court to make an independent determination regarding equitable partition. While there was no testimony regarding the parcel on Old Troy Pike, we note that although the property is a "highly productive parcel of farmland," partitioning it into four distinct portions could make modern farming methods more difficult, as the trial court noted.   Additionally, we agree that the State Route 560 parcel cannot be partitioned due to its small size and limited utility for both agricultural and residential purposes, due to its location in a flood zone.

{¶ 73}  Regarding the Eris Road parcel, we agree with the trial court's observation that the brothers did not dispute the Commissioner's characterization thereof, namely that only 55 of the 115 acres on Eris Road are tillable, that the fields are small and subject to erosion, and that the land exhibits deferred maintenance.   We further agree with the trial court's conclusion that partitioning the tract four ways would result in fields too small for modern farming practices.   In other words, the value of the "chopped up" parcel would be less than the whole, and division would prevent the commercial use of any individual parcels due to their small size.

{¶ 74} Regarding the brothers' assertion that the commissioner failed to consider all possible alternatives to the sale of the property, we note that in their objections, the brothers asserted that they "have previously put forth * * * a plan for dividing approximately 43 acres of property occupied by Defendant John J. Underwood from the balance of the farm and believe that such division can be made without causing 'manifest injury.' " The brothers further argued that such a division "will simplify these proceedings and obviate the need for the Court to determine the ownership and value of improvements constructed on the premises" by John.

{¶ 75} R.C. 5307.07, by its plain language, gave the commissioner the discretion, based upon the fact that the parties each have an equal life estate in each parcel herein, to consider the whole of the properties when considering partition, as opposed to setting off to each sibling a separate interest in each tract. As the trial court noted, "the statute does not mandate consideration of such divisions." The Commissioner testified that he did not consider dividing the 115 acre parcel on Eris Road into two pieces, as John proposed, and we agree with the trial court that such a division would have been inequitable to the sisters for the reasons set forth in the trial court's decision, namely that, by John's own admission, the center of the lane is the only access point to the 72 acres, and the sisters would be required to obtain an easement from him to access their portion of the land or construct a driveway thereon. Further, the wooded portion of the acreage is less valuable per acre, as reflected in the commissioner's report. As the trial court noted, under John's proposal, if Jay received the Old Troy Pike and State Route 560 parcels, Jay would receive more than one-third of the fee simple value of the entire Property. Finally, given the disparity in utility between the 43 acres John sought and the

remaining acreage on the Eris Road parcel, we cannot agree that owelty is applicable.

**{¶ 76}** Since intentional misconduct, corruption, partiality, an exceeding of the commissioner's authority, or gross inequality are not demonstrated, and in the absence of an error apparent on the face of the record, we will not disturb the trial court's adoption of the commissioner's conclusion that the Property cannot be equitably partitioned without manifest injury to its value. The brothers' first assigned error is overruled.

**{¶ 77}** The brothers' second assignment of error is as follows:

THE TRIAL COURT ERRED BY ACCEPTING THE COMMISSIONER'S REPORT WHERE THE REPORT CONTAINED AN APPRAISED VALUE FOR THE PROPERTY IN FEE SIMPLE, BUT FAILED TO PROVIDE AN APPRAISED VALUE FOR THE LIFE ESTATE.

**{¶ 78}** The brothers assert as follows:

The trial court, in its Order adopting the Commissioner's report, notes that the value ascribed to the life estates by counsel for Appellants appeared to be an appropriate value for said interest. * * * Counsel for Appellants is not a certified appraiser, and he was merely discussing one possible methodology for determining the life estate. That job is * * * tasked to the commissioner to present a valuation of the estate for the court's consideration pursuant to R.C. § 5307.09. In his case, the Commissioner failed to do so, returning to the court instead a value in fee simple which is grossly different than the value of the relevant life estates. Accordingly, the decision of the trial court should be reversed and remanded for further proceedings.

{¶ 79} The sisters respond that the brothers' argument "ignores the Trial Court's *Journal Entry* which specifically stated the Commissioner was instructed to determine the value of the fee only." The sisters further note that the trial court "then ordered the parties to submit briefing on their preferred methodology to calculate the value of the life estate interests. Once the methodology was determined, the Trial Court could either direct the Commissioner to consult with an expert or appoint a second Commissioner." The sisters assert that the next step is determined by "Appellants' disclosure of their preferred methodology to calculate the value of the life estates. Depending on the preferred method, the Trial Court or Commissioner may require the assistance of an accountant, economist, or some other type of expert."

{¶ 80} In a footnote, the sisters assert as follows:

As long as the values are applied equally, Appellees have deferred to Appellants on this issue as they feel the appraised value does not need to be absolutely accurate. Unlike other partition cases where one party is only looking to sell, Appellees have offered to sell their life estate interests or purchase Appellants' interests. Appellants have stated they wish to keep the Property. If the appraisal comes in high or low, the Property will proceed to public sale wherein the parties can bid what they feel is the true value of the life estates.

{¶ 81} We agree with the sisters that the brothers' argument lacks merit. As noted above, R.C. 5307.09 requires that a commissioner of the opinion that an estate cannot be divided without manifest injury to its value "return that fact to the court of common pleas with a just valuation of the estate," and the trial court so ordered. The court further

ordered the brothers to file and serve their valuation of the life estates as well as their calculations thereof, based upon the Commissioner's determination, pursuant to R.C. 5307.09, of the fee simple value of the entire estate ($736,500.00.) The sisters indicate that they defer to the brothers' methodology for calculating the value of the life estates, and the trial court granted them an opportunity to object thereto. Any argument that the trial court erred in adopting the Commissioner's valuation of the fee simple value of the Property ignores the requirements of R.C. 5307.09, and any argument that the matter be reversed for further proceedings for the Commissioner to determine the value of the life estates not only ignores R.C. 5307.09, but is also premature, based upon the trial court's order. The brothers' second assignment of error is accordingly overruled.

{¶ 82} The brothers' third assignment of error is as follows:

THE TRIAL COURT ERRED BY ACCEPTING THE COMMISSIONER'S REPORT WHERE THE REPORT OVERSTATED THE VALUE OF THE SUBJECT REAL ESTATE BY FAILING TO DEDUCT THE VALUE OF IMPROVEMENTS MADE BY APPELLANTS.

{¶ 83} The brothers assert that the Commissioner's report "over-states the value of the subject real estate by failing to deduct, therefrom, the value of Defendant John J. Underwood's personal property and improvements, including a mobile home, water well, and septic system." According to the brothers, "the testimony at the hearing revealed that the mobile home is taxed separately from the real property on which it sits."

{¶ 84} The sisters respond that the trial court "clearly considered whether the mobile home had become a fixture and whether Appellants were entitled to reimbursement." The sisters further assert that "Appellants' only argument appears to

be the mobile home is taxed separately from the Property, a fact the Trial Court considered."

{¶ 85} In *Holland Furnace Co. v. Trumbull Savings & Loan Co.,* 135 Ohio St. 48, 19 N.E.2d 273 (1939), at syllabus, the Supreme Court of Ohio noted as follows:

1. A fixture is an item of property which was a chattel but which has been so affixed to realty for a combined functional use that it has become a part and parcel of it.

2. A fixture is to be determined by the consideration of a combination of the following tests: (1) To become a fixture it is essential that the chattel in question be annexed to some extent to realty. (2) The chattel must have an appropriate application to the use or purpose to which the realty to which it is attached is devoted. (3) There must be an actual or apparent intention upon the part of the owner of the chattel in affixing it to realty to make such chattel a permanent part of such realty. * * *

{¶ 86} As the trial court noted, the record supports a conclusion that John intended to make the mobile home a permanent part of the Eris Road property. He testified that he resided in the home "someplace around 30 some years," having purchased it in 1982, and the Commissioner testified that the mobile home "appeared to be sitting on a permanent foundation," and that it includes an addition. In response to questions by the court, counsel for the brothers, after conferring with John, advised the court that the mobile home is affixed to the foundation with hurricane straps and that it is without wheels. We further agree with the trial court that the installation of the septic system and the well, which allowed the mobile home to function as a permanent residence on the farm, further

supports our conclusion that John intended to make the mobile home a permanent part of the Eris Road property, and that the septic system and well are also fixtures.

**{¶ 87}** For the foregoing reasons, we conclude that the brothers' third assignment of error lacks merit, and it is overruled.   The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

David A. Skrobot
Robert J. Simon
Wayne E. Southward
Gregory R. Flax
Donald Mayer
Hon. Nick A. Selvaggio